Good morning. May it please the Court, my name is Callie Heller and I represent the appellant Mr. Ronnie Fuston. I'd like to reserve about 3 minutes of my time for rebuttal. Thank you. Your Honours, Mr. Fuston's capital trial and sentencing were unconstitutional in two different ways. First, the jury wasn't instructed on second-degree murder, although under Beck v. Alabama it should have been. And second, Mr. Fuston never should have proceeded to a capital trial at all as he is intellectually disabled. The OCCA unreasonably applied the clearly established federal law to deny that Mr. Fuston was entitled to even an Atkins hearing. We ask that you reverse the District Court's decision denying relief on these grounds. I'll speak first to Proposition 1, which is the denial of Mr. Fuston's due process rights under Beck v. Alabama. Mr. Fuston's trial included multiple pieces of evidence connecting him to the crime, and his attorneys didn't present any witnesses. His jury faced the exact dichotomy that Beck highlights, evidence of guilt of a serious and violent offense, but doubt with respect to an element that would justify a capital conviction, but no third option. Mr. Fuston's trial also included evidence of an act imminently dangerous to another person regardless of human life and evincing a depraved mind, but without premeditated design to affect death. The shooting came on the heels of multiple days of fighting between friends of Mr. Fuston and the victim's niece on the phone, on social media, and in person, with the latter including acts of vandalism and a gun fired into the crowd. The state's star witness testified that he and Mr. Fuston received a phone call in Enid, Oklahoma about the fighting that had been going on, traveled to Oklahoma City, and then the group that at that point included Mr. Fuston went to the victim's niece's house for, quote, another fight. And the state's crime scene reconstruction evidence showed that the shooting occurred almost simultaneously with the front door being There was no evidence that it was known that anyone would be directly inside and in the bullet's path. And despite Apley's arguments to the contrary, all of that evidence can be considered by this court in analyzing the OCCA's opinion under the AEDPA. Well, when you say we analyze it under AEDPA, under what standard? Under D1 or D2. Okay, so we are differential, you agree with that? Absolutely. Okay, good. On the other hand, Mr. Fuston does not need to prove that there was insufficient evidence to convict him of first-degree murder. As this court has said, focusing on the strength or presence of the first-degree murder evidence would deny a lesser-included offense instruction precisely where it is most important, where the evidence would support a conviction of first-degree murder but would also support a conviction under the lesser-included offense. The OCCA, nonetheless, made the evidence supporting first-degree murder the focus of its inquiry, as it has done repeatedly. Well, but it did state the correct standard several times, did it not? Yes, it did. It did. But that, nonetheless, does not suffice to make its opinion a reasonable application of Beck similarly to this court's opinion. Okay, so it did apply. We can assume it applied Beck, but just didn't apply it correctly. It invoked the proper standard. It didn't apply that standard. Correct. That's your argument? Okay. It recited the standard correctly but then applied it unreasonably. In one of his earlier verses on this issue, this court explained that the distinct questions under Beck are the sufficiency of the evidence of the greater offense is distinct from Beck, which asks whether the evidence might allow a jury to acquit on the greater and convict on the lesser. The OCCA here collapsed these inquiries, holding that the evidence clearly supports a finding that when an appellant fired the decedent, he did so with the intent to kill. Therefore, the evidence would not permit a rational jury to find the appellant guilty of second-degree murder. In other words, because the first-degree evidence supported a finding of intent, therefore, no second-degree instruction was warranted. Well, that would be the wrong standard. That would be applying the wrong standard. And there is one sentence that suggests that, but there are other sentences that state the rule is there may be sufficient evidence for first-degree murder, but no reasonable jury would convict for second-degree murder under these facts. And isn't that what we have to review? Was that an unreasonable decision to say that on these facts, no jury would have convicted under second-degree murder? I want to make sure we have the right standard of review. Do you agree that that's the correct standard of review? Yes. Yes, Your Honor. And so the OCCA did set out the correct standard, the correct standard for reviewing the evidence. But they made this statement, which brought the opinion in line with several of the opinions where this court found that the OCCA was not entitled to deference in Williams and Phillips and Taylor, where this court made some variation of finding that the OCCA did not explain why the evidence didn't support second-degree, except that it did support first. And the OCCA, again, explicitly said the evidence supported first-degree, therefore, the jury could not have found second, sandwiched in between, reciting all of the ways that the evidence would have supported first-degree. The OCCA did take a bit of a different step than it had in some of these prior cases by saying a review of the evidence, a review of the record, shows that there is no evidence that would have supported a second-degree murder instruction. But in light of the substance of its opinion and the conclusion it makes, as this court stated, the Edpa inquiry focuses in Grant v. Royal, the overall substance of its opinion was clearly focusing on first-degree evidence, just as Paz. I thought it was saying that the evidence here of intent is such that no reasonable jury could find that he didn't intend to kill. There are two steps in the murders as I understand it. The evidence apparently shows that he, they broke in the door and just started firing, but then he saw the victim move and fired two shots after that. And I read the OCCA opinion to say that given the second shooting, there can be no reasonable person could determine that the murder was not with intent to kill that person. So the state's crime scene reconstruction evidence, we don't believe, can be read to show a second shooting. So the statement that Mr. Butler, the state's star witness, made was that Mr. Houston, after the shooting, said, I fired multiple times because I saw a reaching for something. So is it possible that that can show intent? I don't think it's impossible, but as this court found in Phillips and in Hogan, we can still have plausible alternative inferences. And that's not intended to rule out providing the jury what's in their purview to weigh the evidence and decide which verdict best fits it as long as that low standard of some evidence is presented. So a crime where someone kicks the door open and simultaneously, as the state's evidence showed, shots were fired across the threshold, some of which missed entirely and went into the fireplace. This is an act that could also comport with, like in Taylor, shooting because you saw movement. And then that doesn't necessarily have to mean intent to kill. It could intend to harm, intend to disable what you, in the heat of the moment, perceive as a threat. So there are alternative inferences to that. And so in a case like that, that means you cannot only have a first degree instruction. But we're not reviewing that de novo. Our standard is, what you're saying is it was unreasonable for the OCCA to hold that the evidence, which you're challenging here, of intent was so strong that no reasonable juror could have convicted just on second degree. The standard of view is so important in these issues. So I want to make sure that I'm stating what our job is in this case. I agree. And I think that's absolutely in accordance with what the OCCA said. And that is unreasonable, either under D1, which is right in line with the way this court ruled in Ritchie, where this court said that it was an unreasonable application of Beck to find that the evidence was insufficient to raise a reasonable doubt as to intent. Or it could also fall under an unreasonable reliance on an unreasonable determination of fact under D2. In Boyd, for example, was a D2 Beck case in this court. And there, the evidence of intent where a gun was placed directly to, I think, either the head or the chest of a police officer and the defendant's evidence for a second degree instruction was that he blacked out at the time. And the OCCA said there's no evidence presented that would support a second degree instruction. And that was not unreasonable under D2. But because this is such a mixed question of fact and law and looks at the evidence presented, we would contend that that not only overcomes AEDPA deference because of an unreasonable application of Beck and or an unreasonable determination of facts, but also is an entitlement to Beck relief under de novo review after the AEDPA is overcome. And as I'm understanding what you're saying, the key to your argument about it being unreasonable inference is that the OCCA must have inferred, decided that the evidence that he shot at the moving person was weak enough that a jury might have or could reasonably have rejected that testimony. Is that the essence of what your argument is here? I think that's right, Your Honor. And I think the reason we have to infer that is because, like in Williams, we don't know why the OCCA found that the evidence could not give rise to a second degree murder. Well, I thought it was because, you know, I thought the OCCA was relying on the evidence that the defendant, after bursting into the building, saw someone move and it was no longer just random shooting. He was trying to kill the person who moved by shooting two more times. I thought that was its reasoning. And what I understand you to be saying is that reasoning is based too much on questionable evidence. I think that read that was in the larger context of an adjudication that proceeded solely on examining and reciting and relying on the first degree evidence. So the OCCA found that the group meant to form met to formulate a plot to kill Brittany Dillard, which was not that was not the only reasonable view of the evidence. And we would argue that's actually contrary to the evidence that they went to her house and then Mr. Fuston kicked open the door. Also, it was not what the evidence showed. And that he then, yes, fired multiple times because after the fact, as Mr. Butler testified, he said he saw the victim. Kind of a variation of that. Let's say that he kicks in the door and the first shot was intended to scare the whoever was in the room or in the house. But then he saw a person and and, you know, fired, you know, fired three shots that entered the body, even though the first shot was could support maybe a depraved murder instruction. Can that be dissipated by the subsequent acts that were, you know, intended to shoot directly at the victim? I think you already get second degree under my facts either way. I think I think it can be. And I think, again, that those facts are not that different than the facts in Taylor. That was also multiple shots. And I think what's very relevant there also just related to Taylor is that that was not uncontroverted. So the defendant said he shot multiple times because he saw movement and the argued the path of the shots as shown by the forensic evidence contradict that. And still, it was found that that should have been submitted to the jury to make that weighing determination. As this court said, I believe in Taylor as well. It's that's for that's the purview of the jury. It's not for courts under back to decide which best fits the evidence or it's just stronger. Unless there are further questions on back, I'll move on to our second issue. And our second issue is the state court's violation of Mr. Houston's rights under the Eighth Amendment. The Supreme Court has said again and again over decades that those with intellectual disabilities are exempt from capital punishment and that states must use clinical guidelines to ensure that everyone entitled to that protection receives it. After Andrew V. White, it's more clear than ever that these governing legal principles have the force of clearly established federal law. In this case, that means that applying a strict statutory cutoff in a way that necessarily violates the clinical guidelines unreasonably applies the clearly established federal law. And it violates clinical guidelines to deny even an Atkins hearing to someone with a historical, quote, mild mental retardation diagnosis, multiple qualifying scores under prong one, a lifelong history of adaptive deficits under prong two, yet a single score above the statutory cutoff. We know that from the guidelines and we know that from clinical practice because none of the experts involved in this case made any kind of decision based solely on the 81 outlying score. It's true that Hall applied the clinical guidelines to a case where the underlying decision revolved around a cutoff that was lower than that used here and where the was also an issue. But crucially, Hall specified that it was doing so because the clinical definitions of intellectual disability were a fundamental premise of Atkins. And barely a page of Hall goes by without reference to or reliance on those clinical guidelines, medical standards, and scientific definitions. Hall made clear that where a state ignores those standards, it risks executing a person who suffers from intellectual disability. That risk is all the more intolerable for someone like Mr. Houston, who was denied even a chance to present his evidence. The idea... Was it a misapplication of clearly established law? And it seems like there's a lot of question about what clearly established means in these circumstances. A couple weeks ago, the Supreme Court made an argument on a different case, a similar issue. How can we say it's clearly established here when the Supreme Court's still out there, grant and cert, on related issues? Yes. So I think a critical distinction, and I think you're referring to Smith v. Ham, but a critical distinction there is that this case involves simply passing the threshold without which you're precluded from even presenting your evidence. And so that is in line with the situation in Hall v. Florida. Smith v. Ham revolves around how courts then must make or may make their weighing determinations in making the Atkins decision and how they weigh the evidence. But in cases like Hall and Mr. Houston's case, the defendants are not allowed to even present their evidence. So when it comes to a case like that, however Smith v. Hall comes down, we don't think that that is going to change what the CEFL says in that. So we can still find it was clearly established here regardless of what the Supreme Court does in the pending case? I believe so, Your Honor. Well, the defendant can't put on evidence without some threshold showing. Do you agree to that? Yes. The Oklahoma statute sets a threshold that you may well challenge because it just requires one test score over 175. But in the opinion of the Supreme Court in this case, the Oklahoma Court of Appeals, excuse me, Criminal Court of Appeals, it addresses the five tests administered and really challenges the validity of four of them. One was in full scale, one everyone agrees was not taken properly, and the other two were after the defendant knew that if he did poorly enough, he couldn't be executed. And are we stuck with what the statute says or can we look to what the OCCA actually did and decide that in this circumstance, it wasn't a denial of due process to say that the defendant hadn't passed the threshold for putting on evidence? I think that if we were here after an Atkins trial or hearing and arguing that the fact finder did not properly weigh various findings in a battle of the experts, that would be a very different question. But I think here, the OCCA making findings like that, that is not why Mr. Houston was disentitled to a hearing. So the 81 score is what disentitled him to a hearing. So if the OCCA, if he didn't have what was found to be disqualified. Yeah, that was disqualified under the statute. What if the OCCA goes further than the statute, is more lenient toward defendants than the statute is? Does that make a difference? I don't know that it would make a difference because the OCCA is not the fact finder. So the OCCA didn't, they weren't making a determination of whether he's intellectually disabled. So even several of those pieces of evidence, that's refuted. So he, several of those scores were after the developmental period and after he was charged with capital murder, but that's not supposed to be relevant under clinical guidelines. And even aside from that, he was administered several malingering tests, including by the state's expert and was found to not be malingering and making good efforts. So the OCCA kind of cherry picking certain facts that have questionable relevance. Again, I think if that were, if those were findings made by the fact finder after a hearing, then the argument could be whether that was proper under Atkins or a denial of due process or the standard for making an Atkins determination and was that met. But here, those questionable facts, I don't think that they entitled Mr. Houston to any more protection in the statute. So I think the way that one of Mr. Houston's prosecutors put it before the trial is very illuminating here. He said that the idea that there's some score that an intellectually disabled person could not attain and that what that score is, is subject to debate among professionals, underscores this violation. Because all the professionals involved in this case, either found that Mr. Houston meets diagnostic criteria, despite the single outlying score, or had to move on to consider the adaptive functioning evidence, including the state's expert, despite the single outlying score, which also illustrates again why all of this evidence should have been before the fact finder to make the same determinations and weighing of evidence and facts. Whatever the IQ threshold above which a professional could not diagnose or even consider intellectual disability, in this case it has demonstrably not been met. The OCCA applied the strict cutoff anyway and found that this obeyed Supreme Court law due to an unreasonably narrow definition of what that law entails. The Eighth Amendment prohibits Mr. Houston's execution and Supreme Court law entitles him at the very least to a hearing where he is able to prove that. You know, just Oklahoma's statute, I guess, is one of a kind, isn't it? Yes, Your Honor. A lot of states have variations on it, but it's the only one that has like if you're above once you were done. Yes. And his high score was at a younger, was that the first test he'd ever taken? And then he was a teenager perhaps, how old was he? Twelve. And you're really, you're not saying, does the Constitution prohibit a bright line cutoff? I don't think we have to necessarily argue that it does in every circumstance. So we're not, we don't need to say that this statute is per se unconstitutional, needs to be thrown away in order for Mr. Houston to be entitled to some form of relief here. Would your argument be the same if there was one score below 75 and one score above? I don't know that it would because our argument is so reliant on clinical guidelines and the clinicians who have been engaged in this case. So I think where you vary those kinds of factors and the IQ scores at issue, you might not have a case where the experts either found that the defendant was intellectually disabled or where even the state's expert proceeded to prong two to consider the other evidence. If you have IQ scores that are so clearly disqualifying or really lean towards that, you might have all experts saying we don't need to consider anything besides prong one, he doesn't have average intelligence and therefore there's no reason for the rest of the Atkins determination. But the statutory scheme doesn't require, if I'm understanding correctly, doesn't require any evidence from clinicians. It's kind of a, you know, the state would say we don't need to look at these these examinations where, you know, all we need to know is the score. And I really, I spot your argument that here we have, you know, experts that have looked at this person and have these diagnoses, but I think the state might say that's irrelevant. And I think, but you might say, well, he had one score of 74 and another one of 100, you know, you'd be probably making a different argument. That might be a very different case. And I think, you know, if the state does say that's irrelevant, I think that only underscores what the problem is. Clinical guidelines say that that can't be irrelevant. You can't, like I cited in Hall and relied on in Hall, clinicians and their guidelines say that you can't simply say an IQ is final, conclusive, standalone evidence of, or evidence against intellectual disability. You need to rely on clinical judgment and you need to be able to look at the weighty and substantive, which was the language used in Hall, evidence that those in the medical community would consider probative even with an IQ score above 70. Thank you. Thank you. Thank you. I'll reserve some time. Thank you. Good morning, your honors. May it please the court. My name is Michael Trapasso and I'm here on behalf of the warden, Christy Quick, who is the respondent in this case. I'll begin first with Petitioner's Beck claim. In ground one, he claims that it was a 14th Amendment violation for the court not to instruct on second degree murder, but Petitioner fails to meet his burden under both D1 and D2 for multiple reasons. Primarily, as this court noted in questioning Petitioner's counsel, the OCA applied the correct standard here. Petitioner even conceded that. This is not, this case is different from Williams, Phillips, Taylor, Hogan, because here the OCA did not purely rely on the evidence supporting first degree murder. The OCA concluded that there was no evidence supporting a second degree murder instruction and thus there was no evidence from which a rational jury could find Petitioner guilty of second degree murder. Specifically, this is what the court wrote. A review of the record showed Petitioner did not present any evidence, nor did this case provide any, showing he engaged in imminently dangerous conduct and extreme disregard for human life. Based on that conclusion, the court said that a reasonable jury would not have, the evidence would not have permitted a rational jury to find him guilty of second degree murder. Well, let me, let me ask you some questions about that. If the evidence were clearly that all that happened was he threw open the door and shot randomly and there were no later two shots at someone who he saw move, would that support a second degree murder conviction? If the evidence supported purely shooting recklessly... And bursting open the door and shooting, yeah. Potentially, Your Honor, but that is not the situation presented here. Well, that's what I want to ask about because what opposing counsel was suggesting is the evidence that went beyond that was questionable evidence. It was not, Your Honor. Specifically the evidence on which, well, let's talk about what the OCA based its decision on first. And this is unrebutted by facts from the record on Petitioner's side. The OCA based its decision primarily, excuse me, on the finding that... I'm sorry, let me get to my right page here. I'm sorry, just one moment. And specifically the court based its finding on the fact that Petitioner had been recruited by his fellow gang members to drive from, to find and kill Ms. Dillard. And that he drove from Enid to Oklahoma City where they met together to formulate a plan to achieve that end. And that when he kicked in the door, he had the intent to kill anyone in the room. Let's talk about the evidence even accepting primarily that, let's say, Petitioner kicked in the door or was shooting as the door was being kicked in. That actually supports a finding of premeditation, Your Honors, because we have to consider the evidence as a whole. The other evidence was not suspect. We have the crime scene reconstructionist testifying that the room in state exhibit 35 shows the room was roughly from the door to the back wall was about 20 feet, give or take. We know Petitioner was seated on the closest end of the... Or excuse me, Mr. Rhodes was seated on the end of the couch closest to the door. And all of the bullets were directed north at where Mr. Rhodes was seated. This is not a situation where he merely sprayed the room or was just shooting recklessly. Petitioner went into that home and fired five shots at Mr. Rhodes. And we know that because he said that, because he said he saw Mr. Rhodes move, which shows he had... And the physical evidence supports that. Yes, Your Honor, because all of the bullets were fired from Petitioner's gun. The bullet defects were all directed north in the direction of where Mr. Rhodes was seated. The projectile, the fireplace and the chair where other bullet defects were found were all north in the area of where Mr. Rhodes was seated. And moreover, Your Honors, the OCA's decision was supported by the evidence such that fair-minded jurors could agree with that decision. Petitioner must show that there was evidence from which a rational jury could convict him of second-degree murder and acquit him of first-degree murder. He has not met that burden. I point this court to your decision in Grant. There, the court concluded that none of the facts on which the petitioner relied clearly and convincingly unseats the OCA's finding that all of the evidence surrounding the killing suggested a degree of premeditation and that the court could not say, given the facts in this record, a rational jury could have found the petitioner acted without any premeditated design to kill the victim. And to the extent the OCA discussed in its opinion a premeditated design to kill, that is based on the definition of second-degree depraved mind murder. Specifically, second-degree depraved mind murder under Oklahoma law occurs when perpetrated by an act eminently dangerous to another person in evincing a any premeditated design to affect the death of any particular individual. To the extent the OCA is discussing premeditated design in its opinion, that is not discussing insufficiency of the evidence for first-degree murder. That is saying petitioner did not meet the last element of second-degree depraved mind murder, which is that there was no premeditated design. And again, your honors, the uncontroverted evidence on which the OCA based its decision was that petitioner drove from Enid to Oklahoma City at the request of fellow gang members, and he met with them to formulate a plan to kill Ms. Dillard and anyone else in the home. Petitioner has not rebutted that with facts from the record, and that is binding on this court. Moreover, to the extent petitioner, if I heard correctly in his argument, discussed that the evidence did not support a meeting between petitioner and his fellow gang members, that is conclusively refuted by the record. We know that they went to, it was either Ms. Jordan or Ms. Pennon's apartment, to discuss a plan of what they were going to do. So that's... Couldn't a jury have disbelieved that? In other words, discounted the credibility of those planning witnesses. And if that is true, doesn't that get the defendant here closer towards a lack of evidence of premeditation? No, your honor, because you have to consider all of the evidence as a whole. You can't just take one fact specifically to the exclusion of all others. Here, all of the evidence, as I've discussed, the direction of the bullet defects, the physical evidence corroborates, taken as a whole, with the evidence on which the OCA based its decision, shows a premeditated intent to kill here, your honor. That's not what I'm saying there. I mean, that, you know, the witness statements, you know, it's credibility and all that, and they say what they say. But the question, you know, the jury discount the credibility of these witnesses in such a way that would get a possibility of a second degree conviction. I do not believe they could, your honor. Based on the evidence taken as a whole, I do not believe they could disbelieve that. Especially when you consider the evidence showing that the state presented cell phone logs, showing petitioners conversations with the government phone used by Ms. Jordan and Ms. Pennon collectively, showed not just leading up to the murder, but the day of the murder, there were calls. I couldn't even count the number of phone calls between the two cell phones. So we know petitioner was discussing this extensively with Ms. Jordan and Ms. Pennon and the other gang members. And then we know as he came down to Oklahoma City, they were still discussing it and they meant to discuss it. And they continued, even though they drove through South Oklahoma City looking for someone to rob, the phone calls leading up to the murder show and the cell location data show that they were driving all in the same direction towards the Rhodes home. So all of the evidence taken as a whole, I do not believe a rational jury, and a rational jury would not have been able to find petitioner guilty of second degree murder in this case. Did you say a government phone? Yes, your honor. So there was the, so the Ms. Jordan and Ms. Pennon had a friend who would go and purchase a large number of government phones. You could go to a stand and just, if you were collecting welfare or other government benefits, you could sign up and just get a free cell phone. Okay. And that's the phone that they primarily, they had their friend. Yeah, I was thinking someone was acting undercover or something. Oh, no, I apologize, your honor. No, no, that's. Yeah, sorry. But yeah, it basically, if you were collecting public benefits, you could get a government phone and that's what they use to formulate their plans for this. The only argument which petitioner relied at the OCA regards the timing of the shots, and that is the only argument on which he can rely here, your honors. To the extent he points to Mr. Butler's testimony that he guessed they were going back to the Rhodes home for another fight, that is not properly before the court. And further, it's not even a fact on which petitioner is relying here when he says the timing of the shots. It's an inference from a singular piece of evidence to the exclusion of all of the other evidence presented at trial, your honors. And this court has repeatedly concluded that speculation is insufficient to meet your burden of showing entitlement to a lesser included offense instruction in Darks, which the court even reviewing DeNovo, there the court concluded that any inference of provocation was, quote, mere speculation insufficient to establish the provocation needed to support manslaughter. And then in Robodeau, the court, there the petitioner pointed to evidence in the record of prior altercations between him and the victim, arguing that the murder could have resulted unintentionally from another such altercation. And this court rejected that claim first because it concluded it did not square with the evidence, and because speculation about what might or might not have occurred, quote, did not constitute sufficient evidence to require a lesser included offense instruction under Beck. The overwhelming weight of the evidence at trial showed that petitioner had the intent to kill Ms. Dillard and anyone else in the home. Again, as I've discussed, the bullet defects, the physical evidence, the diagram showing how close Mr. Rhodes was to the door, petitioner's statement to Mr. Butler that he shot multiple times because he saw Mr. Rhodes move, and it was supported by the primacy reconstructionist that Mr. Rhodes was indeed moving when he was shot. That was also presented. And we also, again, yes, and moving briefly to D2, your honors, petitioner also fails to meet his burden here to the extent he claims that this was a mixed question of law or fact. The Ocas decision, this court has concluded that even mixed questions of law and fact do not come from the auspices of D2, and that's under Wood. Regardless, he has not shown all fair-minded jurists could agree that the Ocas determination was incorrect. He still has not rebutted the finding of the Oca that he intended to kill at the home. The timing of the shots we submit actually supports that he intended to kill. Also, I would point the court, I apologize for not bringing this up earlier, there's a picture in States Exhibit 36 of a bullet defect in the door, and it shows, looking to that, you can see it's not as if the door was closed when the bullet passed through. The door was clearly open, and the bullet struck, clipped the side of it in the direction of where Mr. Rhodes was seated. Moreover, the Oca did not ignore the evidence as Petitioner claims. It merely concluded there was no evidence from which a rational jury can find that Petitioner did not act with a premeditated intent to kill. And if there are no further questions, I will move to the Atkins claim. Let me start that off with some questions, because reading the transcript of the I didn't listen, but reading the transcript of the recent Supreme Court argument, everyone seemed to treat and accept that Oklahoma was an outlier, which in itself is problematic, but it didn't get any defenders in the argument. And we'll find out what the ultimate decision is in that case. We don't know. You can't always tell by what, as you've learned with this court, you can't always tell from what happens in oral argument. But put that together with the Andrew case, which I must say, I was surprised by the Supreme Court's, I think, reconstruction of what clearly established Supreme Court authority is. How do you get over those two humps? For starters, Your Honor, to the extent Petitioner relies on the transcripts of oral argument or briefing in the Ham v. Smith case, he did not rely on those arguments at the OCA. While those specific statements were not available to him, he could have mustered those same arguments himself. So that is not properly before the court. And to the extent, I'm sorry, Your Honor, what was your second question? I apologize. Oh, Andrew. Yes, sorry. Andrew does not apply here, Your Honors, because we are not arguing there is no clearly established law. The question here is whether the OCA unreasonably applied the general principles of Atkins and its progeny, Your Honors. Andrew was specifically concerned with the discussion of clearly established law. To the extent we are arguing that the Supreme Court, Petitioner's argument misconstrues the Supreme Court arguments. Specifically, the Supreme Court has never held specifically that states cannot use an IQ cutoff score. The Supreme Court has held that states cannot use an IQ cutoff score that does not account for the standard error of measurement. That was the issue in Hall. The Florida Supreme Court's decision was reversed in Hall because it took the Petitioner's 71 IQ score as conclusive, but did not factor in what that score range would be with the standard error of measurement. That's why Hall reversed the Florida Supreme Court's decision. Further, to the extent Petitioner argues that the clinical standards mandate consideration beyond just one IQ score, the Supreme Court has never squarely established what standards apply, how to apply them, what to do in cases of multiple IQ scores like we have here. As such, it was not an unreasonable application of the clearly established law for the OCA to say, as it did in its opinion, the Supreme Court's decisions do not mandate a different outcome. Well, that's the problem. They haven't clearly established that. In Andrew, they hadn't said specifically how to review evidence of sexual misconduct by the defendant. What they said was clearly established was it has to be fair, and that's not a lot more specific than what they've said in the case law regarding intellectual disability and the death penalty. So that's where I'm hung up. I apologize, Your Honor. No, it's not your fault. It's the Supreme Court, to be honest, has not provided extensive guidance on what to do in these situations. But to the extent they have not, it is not an unreasonable application of the clearly established law for a state court to decline to extend a specific rule that has not been squarely established by the Supreme Court. And the Supreme Court has said that repeatedly, particularly in Noles v. Merzaintz. But that's exactly what Andrew disrupts. I mean, it was an unreasonable application of law under the Due Process Clause, and that, before Andrew, required some specificity. And they amped up the level of generality in that case, and you amp it up into this Adkins arena. There's a lot of cases that are suddenly at risk that you thought might not be proper Adkins claims before Andrew. Your Honor, respectfully, I would push back a little bit on that interpretation of Andrew. Andrew was focused specifically on the clearly established law, not unreasonable application. Adkins established the general principle that states cannot execute someone who is intellectually disabled. It left to the states, however, how best to determine who meets that definition. Hall mandates consideration of the standard error of measurement. And to the extent Hall, Brumfield, and Moore require consideration of clinical standards, but not all clinical standards, as the Court said in Moore, it was not... The more general the rule, Your Honors, the more leeway state courts have in reaching outcomes and case-by-case determinations. This is a general rule where the Supreme Court has not squarely established what clinical standards apply, how to apply them, or what to do in situations of multiple IQ scores. And for that reason... Our error in Andrew 1 was thinking that because there are no cases involving this type of evidence, there's nothing to give us sufficient guidance to really review it. So we said we're not going to review that issue. And the Supreme Court said no. Now it went back to us to see was unreasonable application, but there was nothing specific in Supreme Court decisions that gave us any guidance except our sense of fairness. And that's not that different from the guidance the Supreme Court is giving in the intellectual disability arena. Your Honor, I would point the Court to the decision in Moore specifically while the Court noted that clinical guidelines should not be wholly disregarded. It also said that states need not adhere to everything stated in the latest medical journal. So I would think that distinguishes this a bit more from Andrew. Further, Your Honor, to the extent Petitioner asserts that the Supreme Court's decisions mandate consideration beyond a singular, excuse me, IQ score in every case, that is foreclosed by the language in Hall. Specifically at page 723, the Court wrote, the Court agrees with the medical experts that when a defendant's IQ test score falls within the test acknowledged and inherent margin of error, then he should be allowed to present further evidence of intellectual disability. And in Rumfield, that was reaffirmed where the Court again reversed a state court's decision. I apologize for not stating this at the beginning. It is also important to note the procedural posture of the Supreme Court's cases. Hall and Moore were each direct review cases. The issue of AEDPA and the deference required under AEDPA were not applicable in those cases. And to the extent the Court reversed in Rumfield, which was the only habeas case, it was because the state court again failed to account for the standard error of measurement what score that would yield. And notably, the Court explained in Rumfield that if there was evidence of a higher score than 75, that could have rendered the state court's decision reasonable. So I think that's very important to consider as well. If you have a record where the score above 75 looks like an outlier, you know, and maybe that's this case a bit, but you know, there are multiple scores below the threshold. One above, taken when the defendant was young, you know, every other test even before the specter of a murder trial was there were low, and you have, you know, some clinical evidence that's presented. You know, it seems like, you know, the thrust of the case law is, well, the defendant gets an hearing under Atkins. You know, he might lose that, but, you know, he still gets a, you know, a neutral adjudication of the disability question. And here, you know, it's, you know, you don't get that if there's one good score. Your Honor, I would just again say the Supreme Court has not clearly established what to do in situations with multiple IQ scores, and it is not an unreasonable application of the clearly established law to refuse to extend a specific rule that has not been squarely established by the Supreme Court. Would your argument be different if we didn't have that pedeference? I'm not entirely sure. I don't believe so, Your Honor, but this court does have that pedeference. I apologize. But the Supreme Court, again, has never mandated that state courts cannot use a singular IQ score to deny Atkins relief. And additionally, I would also like to touch on this court's prior decisions on this issue, specifically while we maintain that Smith, Tryon, and Postel are still applicable here, despite Petitioner's abandonment of his Flynn Effect claim. In Smith particularly, this court stated, while yes, there is a footnote noting that Petitioner was primarily relying on Flynn Effect, here, Your Honors, or excuse me, in Smith, the court still concluded that the OCA's decision finding its statute constitutional was not an unreasonable, or excuse me, was not contrary to or an unreasonable application of the clearly established law, particularly Hall, because it excludes, the sim-adjusted IQ scores fall outside the generally accepted range for intellectual disability. So even if, and the court in Smith specifically said that Hall focused exclusively on the standard error of measurement. And then in Postel and Tryon, the court appeared to indicate, or appeared to that the issue of the constitutionality of Oklahoma's statute had already been addressed. In Postel particularly, the court noted that it had previously addressed the constitutionality of the statute in Smith. And then in Tryon, the court again concluded, well, the court concluded neither trial nor appellate counsel were ineffective because the petitioner had an 81 IQ score, like the petitioner here, and he, that precluded any ID claim under state law, which we would maintain, and we would maintain that those cases are still applicable here, Your Honors. If I could just reiterate again, Your Honors, Petitioner's argument, to the extent he claims that the Supreme Court has mandated consideration beyond just one IQ score, that has not been clearly established by the U.S. Supreme Court, and it was not an unreasonable application of those cases for the OCA to decline to extend that specific rule that had not been clearly established. Unless there are any further questions, Your Honors, we ask that this court affirm the denial of habeas relief as to both Petitioner's Beck claim and his Atkins claim. Thank you. You don't think we should wait on the Atkins claim to see what the Supreme Court says? No, Your Honor, because we would maintain that that would be teed barred, a new, it would have to be all fair-minded jurists, all reasonable jurists reading the Supreme Court's decisions would have to be able to conclude that the Supreme Court mandated consideration beyond just the singular IQ score, and as we've discussed, that is not the case, and so we would maintain that whatever happens in Hanvey-Smith, that would not affect the outcome of this case, Your Honors. Thank you. Thank you, Your Honors. I'll briefly make a few points about Beck before moving on to Atkins. I first note that the language that Appellee used today and throughout her brief about the evidence needing to be considered as a whole sounds a lot like a weighing determination to me. That's not a standard that has been drawn from any of this court's jurisprudence. The case in which this court used the as a whole language was in Mitchell, which was a case where, one of the cases where this court did not defer to the OCCA because the OCCA did not review the evidence as a whole and excluded a piece of evidence in saying that there was no entitlement to a second-degree murder instruction, which this court did end up agreeing with that determination, but along the way said that there was no epidefference due to the OCCA not viewing all of the evidence. I would second briefly note, we don't dispute that Mr. Fuston met up with the other participants in Oklahoma City and many times throughout the shooting occurring. That does not mean that they were formulating a plan to kill and there's no evidence of that. Mr. Butler's evidence to the contrary, his testimony was that they were going to the victim's niece's house for another fight. There's nothing that makes that evidence speculation and as we briefly discussed in our 28-J response, that is briefly before the court and nothing in Andrew B. Tinsley or anywhere else makes that not fairly presented to the state courts. The trial court sitting there defends, I want this instruction. It seems like the trial judge you sat through the trial is going to evaluate the evidence as a whole necessarily to answer the Beck question and decide whether the Oklahoma element of not done with the intention of taking the life, there's evidence that would support a jury conclusion of that. He was supposed to, Your Honor, that's right and I think some of this court's cases like Turrentine and Taylor, that was part of the equation that there was a decision for a second degree instruction, but it was the instruction itself. I'm just saying that the trial judge is going to be looking at the evidence as a whole necessarily. Yes and here we contend that he violated Mr. Fuson's due process rights in that decision and finally briefly I'll just speak to Grant, which was brought up. The evidence there was a disputed evidence that there was a mental infirmity that prevented the intent from being formed and the evidence, the defense's expert did not actually present evidence of that, so that was rejected and that's similar to Bryson which the state in Williams said was an example of a case showing that sometimes the evidence of intent is so strong that there's no need for a second degree instruction and this court in Williams distinguished that and said in Bryson included evidence of plotting for a month and similarly here our case is distinguished. I'll move on to a brief rebuttal of some points in the Atkins claim. We would contend that the Supreme Court has provided extensive guidance and how to adjudicate Atkins claims just because these have been the forms of more general clinical guidelines does not change what the result needs to be. We saw Mr. Hall who had a high score of 80 receive relief back in state court. We saw Mr. Moore receive relief from the Supreme Court with a high score of 78 in Oklahoma. They would have been executed. Not adhering to everything in the Atkins claim does not mean that they disregard clinical guidelines. Thank you. Thank you, counsel. You got a lot in your time. That's helpful to us. Case is submitted. Counselor excused and court is adjourned, right?